Stephen R. Jaffe    SBN 48539
The Jaffe Law Firm
1 Sansome Street, Suite 3500
San Francisco, CA 94104
stephen.r.jaffe@jaffetriallaw.com
415.618.0100
Attorneys for Plaintiff J
ALBERT MARK GOLD

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT MARK. GOLD,<br><br>        Plaintiff,<br><br>    vs.<br><br>ILLUMINA, INC., a Delaware corporation, and VERINATA HEALTH, INC. a Delaware corporation,<br><br>        Defendants. | Case No. _____<br><br>COMPLAINT FOR DAMAGES and DECLARATORY RELIEF:<br><br>[1] UNLAWFUL WORKPLACE RETALIATION (CA Labor Code §1102.5;<br><br>[2] VIOLATION OF CA BUSINESS & PROFESSIONS CODE §17200;<br><br>[3] WRONGFUL TERMINATION AGAINST PUBLIC POLICY OF CALIFORNIA<br><br>[4] BREACH OF WRITTEN CONTRACT |

"No man is more hated than he who speaks the truth"  - Plato

1
**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiff ALBERT MARK. GOLD , alleges:

## I.

## PARTIES

1. Plaintiff ALBERT MARK GOLD is a natural person and citizen of the State of Massachusetts.

2. Defendants ILLUMINA, INC. ("Illumina") and VERINATA HEALTH, INC. ("Verinata") are corporations organized and existing under the laws of the State of Delaware and maintains its principal place of business in San Diego, California.

3. Plaintiff is informed and believes and thereon alleges that defendant VERINATA HEALTH, INC. is a wholly owned subsidiary of the defendant ILLUMINA, INC.

## II.

## JURISDICTION AND VENUE

4. Jurisdiction of this action is conferred upon this court pursuant to 28 USC §1332.

5. The amount in controversy in this matter, exclusive of interest, costs and attorney fees, exceeds $75,000.

6. Venue is this court is proper because the events and actions alleged herein occurred in the County of San Mateo, State of California, within the geographical jurisdiction of this court.

## III.

## FACTUAL ALLEGATIONS

7. On January 27, 2022,  Illumina "on behalf of Verinata Health, Inc." offered employment to plaintiff as Director of its Clinical Laboratory facility located at 200 Lincoln Centre Drive, Foster City, CA 94404.

2

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

8. On January 28, 2022, plaintiff accepted the offer of employment by electronically signing the written offer of employment from Illumina and/or Verinata. A true and correct copy of the employment offer letter and plaintiff's electronic signature on it is attached to this complaint as Exhibit A.

9. Attached to this complaint as Exhibit B is a true and correct copy of the job description for the employment position accepted by plaintiff.

10. On February 11, 2022, plaintiff and Illumina (but not Verinata) both executed a written arbitration contract ("arbitration agreement"), a true and correct copy of which is attached to this complaint as Exhibit C.

11. Under the heading "Place of Arbitration" the arbitration agreement states, "The arbitration shall take place in the county in which the Employee was employed by the Company at the time the arbitrable dispute(s) or claim(s) arose."

12. At all times mentioned herein, Plaintiff performed all his employment duties and responsibilities in exemplary fashion and to the best of his abilities.

13. In the course and scope of his employment as Clinical Laboratory Director, on March 13, 2022, at 12:08 PM, plaintiff sent an email message to the following management persons at Illumina/Verinata: Maria Cholico, John Buhr, Eileen de Feo, Dawn Iglehart, Sue Beruti and Stewart Comer. The subject title of the email is "All The Legal Stuff." A true and correct copy of this March 13, 2022, 12:08 PM email is attached to this complaint as Exhibit D.

14. Exhibit D is an exhaustive and detailed description of Illumina/Verinata's noncompliance with multiple federal and state statutes and regulations with equally exhaustive specific citations to federal and state statutory and regulatory

3

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

requirements with which Illumina/Verinata was out of compliance.

15.  On March 23, 2022, plaintiff attended a teleconference staff meeting chaired by Dawn Iglehart, Senior Director of Quality at Illumina/Verinata.  Other staff member in attendance at this meeting were John Buhr, Dan Schmidt, Maria Cholico, and Stewart Comer, MD.  At the meeting, plaintiff expressed serious concerns about the multiple ways in which the laboratory facility (which his assigned duties and responsibilities required him to assure was in compliance with federal and state statutes and regulations) was out of compliance with those federal and state statutes and regulations. After he began to speak, Iglehart abruptly terminated the meeting and privately stated to plaintiff that he had "no right to inform her staff" that anything pertaining  to the laboratory was out of compliance.

16.  On April 10, 2022, commencing at 11:08 AM (Pacific Time) plaintiff exchanged a series of text messages with Phillip Febbo, MD, Senior Vice President and Chief Medical Officer of Illumina/Verinata.  In these text messages, plaintiff again described and reiterated to Dr. Febbo the multiple serious issues of noncompliance with federal and state statutes and regulations he had previously set forth in his March 13, 2022, 12:08 PM email message to Illumina/Verinata management and which he attempted to express at the March 23, 2022 meeting.

17.  To continue in business and operate as a clinical laboratory properly licensed and/or certified by the necessary federal and state governments and agencies, Illumina/Verinata was and is required to be in full compliance with all of the applicable federal and state statutory and regulatory requirements described by

4

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

the plaintiff in his March 13, 2022, 12:08 PM email (Exhibit D).

18. Instead of Illumina/Verinata acting immediately to take steps to correct the noncompliance issues plaintiff had pointed out to its management and to Dr. Febbo, Illumina began a series of adverse employment actions and retaliatory actions against plaintiff.  These actions and conduct included, but were not limited to the events alleged Paragraphs 15 and 16, *supra*.

19. On April 22, 2022, solely motivated by plaintiff having reported and complained about Illumina/Verinata's noncompliance with the federal and state statutes and regulations which he previously had reported and set forth in his March 13, 2022, 12:08 PM email message, the March 23, 2022 meeting and the text messages with Philip Febbo, MD, Illumina/Verinata terminated plaintiff's employment without cause or notice.

20. In further retaliation against plaintiff, and wholly and solely motivated by plaintiff having reported and complained about Illumina/Verinata's noncompliance with the federal and state statutes and regulations, as alleged, *supra*, on July 20, 2022, Illumina (but not Verinata) initiated an arbitration proceeding against plaintiff with the Judicial Arbitration and Mediation Service ("JAMS"), Case No. 5340000195.[1]  A true and correct copy of  Illumina's complaint in arbitration is attached to this complaint as Exhibit E.

---

[1] As an illustration of Illumina's animus and malice toward plaintiff, the complaint in arbitration insultingly refers to plaintiff, a nationally renowned and highly credentialed pathologist with multiple degrees including a doctoral-level degree, as "Mr. Gold" throughout the document.

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

21. Notwithstanding the requirement of the arbitration agreement drafted by Illumina/Verinata which Illumina/Verinata required be signed by plaintiff as a condition of him obtaining employment, Illumina did not initiate the arbitration proceeding "in the county in which the Employee was employed by the Company at the time the arbitrable dispute(s) or claim(s) arose," San Mateo County.  Instead, Illumina initiated the arbitration proceeding in San Diego County, where Illumina's maintains its headquarters.  That resulted in a strike list of proposed arbitrators being submitted to the parties which proposed arbitrators were all retired San Diego judicial officers or San Diego lawyers.

22. On August 11, 2022, plaintiff's counsel wrote JAMS to object to the arbitration proceeding not having been initiated in San Mateo County, as required by the arbitration agreement.  However, although JAMS' founding office is located in San Francisco, which covers the entire San Francisco Bay Area, the arbitration proceeding was not moved.  Instead, Plaintiff's counsel received a second strike list of proposed arbitrators.  But the new strike list was not a list of  proposed arbitrators from the San Francisco Bay Area, where San Mateo County is located, but instead was a list of retired Sacramento County judicial officers or lawyers.  Plaintiff's counsel was further informed that the arbitration proceeding would continue to be run and administrated out of JAMS San Diego office by the same case manager originally assigned to the San Diego proceeding. No strike list of proposed San Francisco Bay Area arbitrators has ever been presented to the parties by JAMS.

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

# IV.

## FIRST CAUSE ACTION

## UNLAWFUL EMPLOYMENT RETALIATION

23. The plaintiff incorporates and realleges each and every allegation pleaded in Paragraphs 1 through 22, *supra*, of this complaint.

24. Plaintiff's email message of March 13, 2022, and his subsequent reports and complaints while employed by Illumina/Verinata were protected acts under California Labor Code §1102.5, the California Whistleblower Act.

25. The (a) termination of plaintiff's employment by Illumina/Verinata and (b) the filing of a groundless retaliatory arbitration proceeding against plaintiff were adverse employment actions under Labor Code §1102.5, were solely motivated by plaintiff having engaged in protected acts and were acts of unlawful workplace retaliation.

26. The foregoing retaliation of the defendants against the plaintiff and the termination of his employment violated California Labor Code §1102.5.

27. As the result of such violations, the plaintiff is entitled to recover his actual damages (Labor Code §1105), and/or a civil penalty from each defendant of $10,000 for each violation (Labor Code §§1102.5(f), 98.6(b)(3)) and his reasonable attorney fees incurred in bringing this action (Labor Code §1021.5).

# V.

## SECOND CAUSE OF ACTION

## VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200

28. The plaintiff incorporates and realleges each and every allegation pleaded in Paragraphs 1 through 27, *supra*, of this complaint.

7

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

29. The termination of plaintiff's employment by defendant was an "unlawful, unfair or fraudulent business act or practice" as defined  and set forth by California Business and Professions Code §17200.

30. Defendant is therefore liable to the plaintiff for all of plaintiff's harm and damages proximately arising from the termination of his employment by defendant including, his actual damages, and his attorney fees incurred in bringing this action.

## VI.

### THIRD CAUSE OF ACTION

### WRONGFUL TERMINATION AGAINST PUBLIC POLICY

31. The plaintiff incorporates and realleges each and every allegation pleaded in Paragraphs 1 through 30, *supra*, of this complaint.

32. The termination of plaintiff's employment by defendant violated California public policies created by a statute or regulation, to wit: Labor Code §1102.5 and Civil Code §17200.

33. Defendant is therefore liable to the plaintiff for all of plaintiff's damages proximately arising from the termination of his employment by defendant including, his actual damages, a civil penalty of $10,000 for each violation and his attorney fees incurred in bringing this action.

## VII.

### FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

34. The plaintiff incorporates and realleges each and every allegation pleaded in Paragraphs 1 through 33, *supra*, of this complaint.

8

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

35. By initiating an arbitration proceeding against plaintiff in San Diego County and thereafter failing and refusing to take necessary action to move it to the San Francisco office of JAMS, the defendants breached a material term and condition of the arbitration agreement between them and plaintiff.  As the result of the two material breaches of the arbitration agreement alleged herein, Illumina and Verinata have waived their right as a matter of law to compel plaintiff to arbitrate any employment dispute purportedly described in the arbitration agreement.

### REQUESTS FOR RELIEF

Plaintiff requests the following relief:

A.  For general and special damages in excess of $75,000 and according to proof at trial;

B.  For interest on such damages from the date of their incurrence;

C.  For civil penalties and fines as may be applicable by law;

D.  For plaintiff's reasonable attorney fees incurred in bringing this action.

E.  For a declaration of this court stating that, as the result of the two material breaches of the arbitration agreement alleged herein, Illumina and Verinata have waived their right as a matter of law to compel plaintiff to arbitrate any employment dispute purportedly described in the arbitration agreement.


Dated:   September 5, 2022          THE JAFFE LAW FIRM

By: _____/s/_____
            STEPHEN R. JAFFE
      ATTORNEYS FOR PLAINTIFF


9
**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

# EXHIBIT A



Verinata Health, Inc.
800 Saginaw Drive
Redwood City, CA 94063
website: www.illumina.com

January 27, 2022

Bert Gold
1601 DALE AVE
San Mateo, California  94401-3418

Dear Bert:

Congratulations! We are pleased to extend to you (the Employee) this offer of employment with Verinata Health, Inc.(the Company) for the Director, Clinical Pathology position based on the terms and conditions set forth below. You will report directly to Eileen de Feo - VP, Global Clinical Lab Services. Your principal place of work will be  200 Lincoln Centre Dr.  Foster City California 94404. Your employment will begin on a date to be mutually agreed upon by you and the Company.

For full-time regular employment, your annual base salary will be $330,000.00 USD.

You are eligible to participate in Illumina's Variable Compensation Plan (VCP). If your hire date is on or before October 1, you will be eligible to participate in the current year VCP on a prorated basis. If your hire date is after October 1, you will be eligible to fully participate in the following year's VCP. Your VCP target is 17% of your base salary. VCP target is not a guarantee or entitlement to payment of that percentage. Rather, your actual incentive compensation will be based on the achievement of company goals, individual performance, and is at the discretion of management. You must continue to be employed by Illumina on the date of payment to be eligible to receive a VCP payment. Details of the plan will be provided to you in the near future.

If you accept the offer and are hired, you will be granted the equivalent value of $150,000.00 (USD) in Restricted Stock Units (RSUs) effective on the 5th day of the month following the month that you are hired. The number of RSUs you receive will be determined by dividing the equivalent value of your award by the closing stock price on date of grant, rounded up to the next whole share. If the NASDAQ stock exchange is closed on the 5th day of the month following the month you are hired, the RSUs will be granted on the first day after the 5th day that the exchange is open. The RSUs vest over four years with each 25% increment being released on the 5th day of the month of the grant date. The RSUs will be granted pursuant to, and governed by, the Illumina, Inc. 2015 Stock and Incentive Plan.

In addition, you will be eligible for the company's Annual Equity Grant (AEG) in accordance with the company's terms and conditions.  If your hire date is on or before October 1, you will be eligible to participate in the current year AEG. If your hire date is after October 1, you will be eligible to fully participate in the following year's AEG.

You will be eligible to enroll in the Employee Stock Purchase Plan (ESPP) each January and July, for the offering periods beginning on February 1 and August 1.

You are eligible to participate in Illumina's Deferred Compensation program. The details of the Plan and the enrollment process will be provided to you subsequent to your acceptance of this offer.

Your salary is payable every other week, one week in arrears and subject to standard payroll deductions and withholdings. Your first paycheck will be prorated based on your employment start date.

You will be entitled to receive the Company's standard benefits in accordance with Illumina's policies, the applicable plan documents, and benefit plan provisions. Your eligibility for extended health care, disability insurance, and life insurance begin on your date of hire. The Company may modify benefits from time to time as it deems necessary.

Your employment will be at-will, which means it may be terminated at any time by you or the Company with or without notice or cause. By accepting this offer of employment you agree that your employment is terminable at-will. Any prior representations to the contrary are hereby superseded by this offer. This at-will employment relationship cannot be changed except by written agreement signed by the CEO of the Company.

As a Company employee you will be expected to abide by all Company policies and procedures and sign and comply with the Company's standard form of Proprietary Information and Inventions Agreement, which, among other things, prohibits unauthorized use or disclosure of the Company's proprietary information.

This employment offer is also contingent on all of the following: (1) providing proof of your eligibility to work in the United States, (2) signing of the Proprietary Information and Invention Agreement, the Arbitration Agreement and any other new hire paperwork on or before your first day of employment, and (3) satisfactory results of a background check.

At Illumina, we are transforming the life sciences industry. In our quest to improve human health by unlocking the power of the genome, we seek out the best talent from around the world. Our extraordinary employees and platforms make genomic breakthroughs today that were not even imaginable just a few years ago. As part of our team, you will discover that innovation and collaboration is core to everything we do. We are excited to see the impact you will bring to Illumina, and how you will shape the future of the company.

If the foregoing accurately reflects our agreement, please so indicate no later than January 31, 2022.

Sincerely,

Kelsey Weinapple
Sr Talent Acquisition Specialist
on behalf of Verinata Health, Inc.

_____

I accept this offer:

Bert Gold

# EXHIBIT B

# illumina

**Job Description: 28138-JOB - Clinical Lab Director**

Illumina's Laboratory Services Group is currently recruiting a Senior Clinical Laboratory Director who will be responsible for oversight of our high complexity genetic testing CLIA certified laboratories from either our San Diego or Foster City locations. Responsibilities include ensuring competency of personnel performing test procedures; recording and reporting test results promptly, accurately and proficiently; and assuring compliance with all applicable regulations. This role will oversee both our Northern and Southern California labs and the other Lab Directors associated with these labs.

Illumina's CAP/CLIA labs serve a variety of patients using NGS and Array Genotyping as core technologies. The test menu includes Non-invasive Prenatal Testing and Whole Genome Sequencing for Rare and Undiagnosed Disease. This is a highly technical environment in high-complexity testing. We are looking for a leader with technical expertise in molecular biology, experience in running clinical laboratories, and experience managing staff. The primary focus of the lab is execution of existing tests, but we work with R&D on test pipeline and the lab director should be conversant in design control and able to navigate the controlled transfer of design into routine lab practice.

### Responsibilities:

- Management and support of the medical team consisting of lab directors and genetic counselors
- Works with laboratory leadership, marketing, and medical affairs to identify and evaluate strategic opportunities for Illumina which leverage the clinical laboratory
- Provides oversight of interpretation and reporting of special test results, such as solid tumor comprehensive genomic profiling, genetic testing (non-invasive prenatal testing, WGS, etc) as needed
- Provide pathology subject matter expertise to support pharma collaborations as needed
- Provides microscopic examination for selection of tumor area for molecular testing as needed
- Provides consultation of laboratory results with ordering physicians as needed
- Works with cross functional teams within the laboratory for new product launches
- Collaborates cross functionally in development and validation of methods and selection of appropriate tests
- Support and review of appropriate validation studies to implement and ensure high quality, clinically appropriate and regulatory compliant testing services
- Keeps current with medical knowledge as it relates to genetics and oncology and is able to use all relevant information resources to acquire and evaluate evidence-based information
- Strong communication skills; verbal and documentation
- Ensure CLIA and CAP compliance of services and products offered through Illumina Laboratory Services

### Requirements:

- MD or DO in good standing
- Board certified in Anatomic Pathology (AP) or Anatomic and Clinical Pathology (AP/CP)
- Board certification or experience in Molecular Pathology
- Broad industry experience is required
- Previous CRO/Pharma experience is a plus, but not required
- Strong communication skills both verbal and documentation
- Ability to communicate with high level decision makers in the organization
- Personal adaptability and ability to lead change
- Ability to work across skill sets and expertise

Jan 27, 2022 2:16 PM

* Excellent communication skills and interpersonal skills

Listed responsibilities are an essential, but not exhaustive list, of the usual duties associated with the position. Changes to individual responsibilities may occur due to business needs.

Signature: *Rebecca Sole*

EXHIBIT C



## Arbitration Agreement

This Mutual Arbitration Agreement ("Agreement") is entered into between Illumina, Inc., a Delaware corporation, or any of its current and future subsidiaries, parents, affiliates, successors or assigns ("the Company") and the employee named below ("Employee").

### Agreement to Arbitrate Certain Disputes and Claims

The Company and Employee mutually agree to submit to binding arbitration any and all disputes or claims that we could otherwise pursue in court arising from or relating to Employee's recruitment to or employment with the Company, or the termination of that employment, including claims against any current or former agent or employee of the Company, whether the disputes or claims arise in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized, including, but not limited to, the following:

- claims for fraud, misrepresentation, promissory estoppels, fraudulent inducement of contract or breach of contract, whether such alleged contract or obligation be oral, written, or express or implied by fact of law;

- claims for wrongful termination of employment, violation of public policy and constructive discharge, infliction of emotional distress, interference with contract or prospective economic advantage, defamation, unfair business practices, invasion of privacy;

- claims for non-payment or incorrect payment of wages, commissions, bonuses, severance, employee fringe benefits, or stock options.

In addition to our agreement to arbitrate all disputes, we agree that either party may seek injunctive or other provisional relief from a court of competent jurisdiction relating to any dispute covered by this Agreement as provided in the California Arbitration Act.

We understand and agree that the arbitration of the disputes and claims covered by this Agreement shall be the sole and exclusive mechanism for resolving any and all existing and future disputes or claims arising out of Employee's recruitment to or employment with the Company or the termination thereof, except for Employee's claims for workers' compensation benefits, unemployment insurance, state or federal disability insurance, and for any injunctive or provisional relief (as provided by the California Arbitration Act).

### Waiver of Right to Trial

We understand and agree that the arbitration of disputes and claims under this Agreement shall be instead of a trial before a judge or jury. We understand and agree that, by signing this Agreement, we are expressly waiving, to the fullest extent permitted by law, any and all rights to a trial before a judge or jury hearing before an adjudicative agency, regarding any disputes and claims which we now have or which we may in the future have that are subject to arbitration under this Agreement. This Agreement does not apply to wage claims brought before the California Department of Labor Standards Enforcement, but does apply to any such claims that are appealed to a Superior Court or similar court of competent jurisdiction.

## No Consolidation of Claims

Employee and the Company agree that neither Employee nor the Company shall be entitled to join or consolidate in arbitration any claim by or against other current or former Illumina employees, nor bring in arbitration any claim as a representative or member of a class. The parties agree that this arbitration provision shall be interpreted as broadly as permitted under applicable law and includes, but is not limited to, claims for fraud, breach of contract, wrongful termination, defamation, discrimination, harassment, misrepresentation, infliction of emotional distress, and claims related to compensation, and wages and hours.

## Arbitration Procedures; Final and Binding Award

The arbitration shall be conducted by a single neutral Arbitrator in accordance with the JAMS Employment Arbitration Rules & Procedures and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness; provided, however, to the extent that any of the JAMS Employment Arbitration Rules & Procedures or anything in this Agreement conflicts with any arbitration procedures required by applicable law, the arbitration procedures required by the applicable law shall govern. The Rules are available at https://www.jamsadr.com/rules-employment. The Company will provide a printed copy of the Rules to the Employee at the Employee's request.

Selection of the Arbitrator shall proceed as follows: First, the parties will attempt to agree on an Arbitrator affiliated with either JAMS or Judicate West. The parties agree that the Arbitrator selected shall be a retired judge. In the event that an Arbitrator from Judicate West is selected, pursuant to JW Commercial Arbitration Rules Rule No. 2.A.2, the Arbitrator will apply JAMS Employment Arbitration Rules & Procedures unless the parties agree otherwise. If the parties cannot agree on an Arbitrator, the selection process shall proceed according to the procedures set forth in Rule 15 of JAMS Employment Arbitration Rules & Procedures such that an Arbitrator will ultimately be appointed by JAMS.

The Arbitrator shall permit both parties to engage in reasonable pre-hearing discovery to obtain information to prosecute or defend the asserted claims. In addition, the Arbitrator shall permit either party to submit, pursuant to a briefing schedule dictated by the Arbitrator, motions that would otherwise be permitted if the matter were pursued in court. The Arbitrator shall issue a written ruling on any such motion that sets forth the essential bases for such ruling.

Also, at the conclusion of the Arbitrator's receipt of evidence, the Arbitrator shall issue a written decision setting forth the award, if any, that explains the essential findings and conclusions on which the award is based. The Arbitrator shall have the authority to award any relief authorized by law in connection with the asserted claims or disputes. The Arbitrator's decision and any award shall be final and binding on both the Company and Employee and it may be entered as a judgment in any court of competent jurisdiction, and shall not be appealable except as required by applicable law.

## Place of Arbitration

The arbitration shall take place in the county in which the Employee was employed by the Company at the time the arbitrable dispute(s) or claim(s) arose.

## Governing Law

We understand and agree that any dispute(s) and claim(s) to be arbitrated under this Agreement shall be governed by the laws of the state in which the Employee was employed at the time the arbitrable dispute(s) or claim(s) arose.

**Costs of Arbitration**

We agree that the Company will bear the Arbitrator's fee and any other type of expenses or cost that the Employee would not be required to bear if he or she were free to bring the dispute(s) or claim(s) in court, as well as any other expense or cost that is unique to arbitration. The Company and Employee shall each bear their own attorneys' fees incurred in connection with the arbitration, and the Arbitrator will not have authority to award attorneys' fees except as required or permitted by applicable law. If there is a dispute as to whether the Company or Employee is the prevailing party in the arbitration, the Arbitrator will decide the issue.

**Severability**

We understand and agree that if any term or portion of this Agreement shall, for any reason, be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this Agreement shall not be affected by such invalidity or unenforceability but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.

**Complete Agreement**

We understand and agree that this Agreement contains the complete agreement between the Company and Employee regarding the subjects covered in it; that it supersedes any and all prior representations and agreements between us, if any; and that it may be modified only in writing, expressly referencing this Agreement and Employee by full name, and signed by the Chief Executive Officer of the Company and signed by the Employee.

**Knowing and Voluntary Agreement**

The Employee has been advised to consult with an attorney of his/her own choosing before signing this Agreement, and has had the opportunity to negotiate the terms of this Agreement. The Employee agrees that he/she has read this Agreement carefully and understands that by signing it, he/she is waiving all rights to a trial or hearing before a judge or jury with respect to any and all disputes and claims regarding Employee's employment with the Company or the recruitment to or termination thereof.

Date: _____

_____
Employee Signature

_____
Employee Name (Please Print)

**Illumina, Inc.**

Date: _____

By: _*Sue M'Grath*_____

Sue McGrath, Vice President, H.R.

CONFIDENTIAL

May 2018
ARBITRATION AGREEMENT

# EXHIBIT D

**From:** Gold, Bert <bgold@illumina.com>
**Date:** Sunday, March 13, 2022 at 12:08 PM
**To:** Cholico, Maria <mcholico@illumina.com>, Buhr, John <jbuhr@illumina.com>
**Cc:** de Feo, Eileen <edefeo@illumina.com>, Iglehart, Dawn <diglehart@illumina.com>, Beruti, Sue <sberuti@illumina.com>, Comer, Stewart <scomer1@illumina.com>
**Subject:** All the LD legal "stuff'

Hi Maria (and Eileen, Dawn, Sue, John, and Stewart),

During our meeting on Thursday, you asked me to review the LD JD.
I anticipated I could just change a few words and have that be the end of it.
But, I think I see a number of regs that need to be vetted by legal before I start
requesting any revisions!

I have gone through the US, California, NY, and Pennsylvania regs to provide the following
legal summary.  I can provide our legal department chapter and verse and connections to
expert legal and regulatory opinions on each point.  I have consulted for Arnold & Porter
in the past, and they regard me as an expert in this area, although I absolutely will defer to
Illumina counsel.

I am also attaching my standard delegation of authority letter to this email, which gives a general sense
of how to accomplish this authority quickly (it's a check box system).

I am not sure we can revise the current JD before the CAP inspection, though.  I would let it
sit, have me sign as read and understood, and have the new one be a project to be completed
before May 1 or whenever you want me to assume the license.  That's my suggestion at this point
and I am totally willing to compromise on anything and everything!

*************************************************************************************

The laboratory director is responsible for the overall operation and
administration of the clinical laboratory, including administering the
technical and scientific operation of a clinical laboratory, the selection
and supervision of procedures, the reporting of results, and active

participation in its operations to the extent necessary to ensure compliance with California Business and Professions Code (BPC) § 1209 and CLIA. He or she shall be responsible for the proper performance of all laboratory work of all subordinates and shall employ a sufficient number of laboratory personnel with the appropriate education and either experience or training to provide appropriate consultation, properly supervise and accurately perform tests, and report test results in accordance with the personnel qualifications, duties, and responsibilities described in CLIA and BPC § 1209.

In California, the term "CLIA laboratory director" means the person identified as the laboratory director on the CLIA certificate issued to the laboratory by the federal Centers for Medicare and Medicaid Services (CMS).

The "CLIA laboratory director" may perform the duties of technical supervisor, clinical consultant, general supervisor, and testing personnel, or delegate these responsibilities to persons qualified under CLIA. If the laboratory director reapportions performance of those responsibilities or duties, he or she shall remain responsible for ensuring that all those duties and responsibilities are properly performed.

**A California clinical laboratory may have multiple laboratory directors.** The person serving as the "CLIA laboratory director" must qualify under CLIA. (BPC § 1209(b)).

California Clinical Laboratories cannot accept a clinical test without a physician referral. (BPC § 1288)

Anyone with a 5% or more interest in a laboratory is considered an owner. (BPC § 1211)
If the laboratory director is not the laboratory owner, then both are jointly and severally responsible for the laboratory. (BPC § 1265 (b))

In California, A laboratory performing tests in genetic molecular biology must have a director licensed as a clinical genetic molecular biologist, pathologist, or bioanalyst who meets CLIA requirements for laboratory director. (17 CCR § 1030.7)

Under New York and Pennsylvania Regulations, a "CLIA laboratory director" may not serve as such in more than two high complexity laboratories simultaneously.

All clinical laboratory results must be reviewed and released by authorized persons (BPC §§ 1206.5 and 1269(d)), except those released by autoverification using a computer algorithm in conjunction with automated clinical laboratory instrumentation (BPC § 1209.5), to the healthcare provider who ordered the tests. (BPC § 1288)

A patient may request from his or her physician to receive test results by internet or other electronic means. (Health and Safety Code (HSC) § 123148)

In California, an interim laboratory director must be appointed within five days of a major change of director if a laboratory is left without a director. (BPC § 1265 (e)(2))

The owner and director of a laboratory must notify CDPH LFS within 30 days of a major change in laboratory director. (BPC § 1265 (g))

TRAINEES
A. A training program must be approved by the Department. (BPC § 1286 and 17 CCR §§ 1035, 1035.1, and 1035.3)
B. A trainee must train in a program approved for this purpose by the Department. (BPC § 1205)
C. A trainee must work under the direct and responsible supervision of the laboratory director or a person other than a trainee licensed under BPC chapter 3. (BPC § 1205)
D. The ratio of licensed persons to trainees must not exceed two licensed persons to one trainee. (17 CCR § 1035 (d))

As part of the overall operation and administration, the laboratory director of a registered laboratory shall document the adequacy of the qualifications (educational background, training, and experience) of the personnel directing and supervising the laboratory and performing the laboratory test procedures and examinations. In determining the adequacy of qualifications, the laboratory director shall comply with any regulations adopted by the department that specify the minimum qualifications for personnel, in addition to any CLIA requirements relative to the education or training of personnel.

As part of the overall operation and administration, the laboratory director of a licensed laboratory shall do all of the following:

(1) Ensure that all personnel, prior to testing biological specimens, have the appropriate education and experience, receive the appropriate training

for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results. In determining the adequacy of qualifications, the laboratory director shall comply with any regulations adopted by the department that specify the minimum qualifications for, and the type of procedures that may be performed by, personnel in addition to any CLIA requirements relative to the education or training of personnel. Any regulations adopted pursuant to this section that specify the type of procedure that may be performed by testing personnel shall be based on the skills, knowledge, and tasks required to perform the type of procedure in question.

(2) Ensure that policies and procedures are established for monitoring individuals who conduct preanalytical, analytical, and postanalytical phases of testing to ensure that they are competent and maintain their competency to process biological specimens, perform test procedures, and report test results promptly and proficiently, and, whenever necessary, identify needs for remedial training or continuing education to improve skills.

(3) Specify in writing the responsibilities and duties of each individual engaged in the performance of the preanalytic, analytic, and postanalytic phases of clinical laboratory tests or examinations, including which clinical laboratory tests or examinations the individual is authorized to perform, whether supervision is required for the individual to perform specimen processing, test performance, or results reporting, and whether consultant, supervisor, or director review is required prior to the individual reporting patient test results.

(g) The competency and performance of staff of a licensed laboratory shall be evaluated and documented by the laboratory director, or by a person who qualifies as a technical supervisor under CLIA depending on the type and complexity of tests being offered by the laboratory.

(1) The procedures for evaluating the competency of the staff shall include, but are not limited to, all of the following:

(A) Direct observations of routine patient test performance, including patient preparation, if applicable, and specimen handling, processing, and testing.

(B) Monitoring the recording and reporting of test results.

(C) Review of intermediate test results or worksheets, quality control

records, proficiency testing results, and preventive maintenance records.

(D) Direct observation of performance of instrument maintenance and function checks.

(E) Assessment of test performance through testing previously analyzed specimens, internal blind testing samples, or external proficiency testing samples.

(F) Assessment of problem solving skills.

Evaluation and documentation of staff competency and performance shall occur at least semiannually during the first year an individual tests biological specimens. Thereafter, evaluations shall be performed at least annually unless test methodology or instrumentation changes, in which case, prior to reporting patient test results, the individual's performance shall be reevaluated to include the use of the new test methodology or instrumentation.

NY LAW

Title: Section 19.3 - Director of a clinical laboratory or blood bank; certificate of qualification

Effective Date
06/12/2019
19.3 Director of a clinical laboratory or blood bank; certificate of qualification issuance, duties and responsibilities.

A NY Laboratory Director shall provide advice to referring health care providers regarding the significance of laboratory findings and ensure that reports of test results include pertinent information required for the interpretation of laboratory data;

(2) maintain an effective working relationship with applicable accrediting and regulatory agencies, administrative officials, and the medical community,

(3) define, implement and monitor standards of performance for the laboratory and for other ancillary laboratory testing programs in conformance with the department's clinical laboratory standards of practice;

(4) monitor all work performed in the laboratory to ensure that medically

reliable data are generated;

(5) assure that the laboratory participates in monitoring and evaluating the quality and appropriateness of services rendered, within the context of a quality management system, regardless of where the testing is performed;

(6) ensure that sufficient qualified personnel are employed with documented training and/or experience to supervise and perform the work of the laboratory;

(7) ensure that policies and procedures are established for monitoring staff to assess competency and, whenever necessary, to provide remedial training to improve skills;

(8) specify in writing the responsibilities and duties of all laboratory personnel;

(9) provide continuing education to laboratory staff;

(10) ensure that a current and complete procedure manual is available to all personnel; and

(11) set goals, develop and allocate resources within the laboratory;

(12) provide effective administrative direction of the laboratory, in conjunction with the individual(s) responsible for financial management of the laboratory, to ensure adequate resources are available to operate the laboratory in a manner consistent with all state and federal requirements;

(13) select all reference laboratories for services not offered by the laboratory;

(14) promote a safe laboratory environment for personnel and the public; and

(15) ensure that the laboratory, when applicable, is enrolled in a proficiency testing program acceptable to the department for the testing performed and that the laboratory adheres to the proficiency testing program's administrative and technical requirements.

REFERENCES:

https://npscerts.com/wp-content/uploads/2019/09/California-Regulations-_-

Requirements.pdf

https://codes.findlaw.com/ca/business-and-professions-code/bpc-sect-1209.html

https://regs.health.ny.gov/volume-title-10/content/section-193-director-clinical-laboratory-or-blood-bank-certificate

https://www.pacodeandbulletin.gov/Display/pacode?
file=/secure/pacode/data/028/chapter5/s5.22.html&d=reduce

---

**Bert Gold, PhD, DABMGG**

Director, Clinical Pathology
Illumina Laboratory Services
858.202.4500 or 302.507.1827 (CELL)
bgold@illumina.com
www.illumina.com





# EXHIBIT E

1  E. JOSEPH CONNAUGHTON (SBN 166765)
   jconnaughton@paulplevin.com
2  AARON J. SCHU (SBN 299701)
   aschu@paulplevin.com
3  **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
   101 West Broadway, Ninth Floor
4  San Diego, California 92101-8285
   Telephone:    619-237-5200
5  Facsimile:    619-615-0700

6  Attorneys for Claimant Illumina, Inc.

7
                        **IN THE MATTER OF THE ARBITRATION**
8
                                  **BETWEEN**
9

10

11  ILLUMINA, INC.,                          JAMS Case No. 5240000195
12
              Claimant,                      **CLAIMANT ILLUMINA, INC.'S**
13                                           **COMPLAINT FOR:**
        v.
14                                           1. **VIOLATION OF PENAL CODE**
    ALBERT MARK GOLD, and ROES 1-10,            **SECTION 502, *ET SEQ.***
15  inclusive,                               2. **BREACH OF CONTRACT**

16              Respondents.                 Arbitrator:          TBD
                                             Action Filed:        July 20, 2022
17                                           Arbitration Date:    Not Set

18      Claimant Illumina, Inc. ("Illumina") alleges and claims against Respondent Albert Mark

19  Gold ("Mr. Gold") as follows:

20                                  **VENUE**

21      1.      Venue is proper in this forum because the parties agreed to submit claims such as

22  those hereby brought by Illumina against Mr. Gold to binding arbitration.  A true and correct copy

23  of the parties' February 11, 2022 arbitration agreement is attached hereto as Exhibit A.

24                                 **PARTIES**

25      2.      At all relevant times herein mentioned, Illumina was a Delaware Corporation,

26  doing business in the State of California, with its principal place of business at 5200 Illumina

27  Way, San Diego, California 92122.

28  / / /

1      3.     Illumina is informed and believes and thereon alleges that at all relevant times

2 herein mentioned, Mr. Gold was an individual residing in San Mateo, California.

3      4.     Illumina is ignorant of the true names and capacities of Respondents sued herein as

4 ROES 1 through 10, inclusive, and therefore sues these Respondents, whether individuals or

5 entities, by such fictitious names. Illumina will amend this complaint to allege their true names

6 and capacities when ascertained. Illumina is informed and believes and thereon alleges that each

7 of the fictitiously named Respondents are responsible in some manner for the occurrences herein

8 alleged, and that Illumina's losses, as herein alleged, were proximately caused by these

9 Respondents and each of them.

10     5.     At all times herein mentioned, Mr. Gold and ROES 1 through 10, inclusive, were

11 the agents of each other, and acted as alleged hereafter within the scope and authority of such

12 agency relationship, and with the knowledge and consent of each other.

13 **GENERAL ALLEGATIONS**

14 **A.   Mr. Gold Becomes Employed By Illumina and is Issued a Company Laptop.**

15     6.     Illumina manufactures and sells innovative technologies in the field of genetic

16 variation and function, including sophisticated and cutting-edge products in the fields of DNA and

17 RNA analysis, and genetic sequencing applications.

18     7.     Illumina operates in a fiercely competitive industry, and its confidential and

19 proprietary information is among its most valuable assets. Illumina is currently recognized as the

20 worldwide leader in genetic sequencing technologies.

21     8.     In or around February 2013, Illumina acquired Verinata Health, Inc. ("Verinata"), a

22 leading provider of non-invasive prenatal testing and now a wholly owned subsidiary of Illumina.

23     9.     Illumina takes great measures to protect its confidential and proprietary

24 information. It instructs employees to maintain the secrecy of its information. It further requires

25 employees to execute a Proprietary Information and Invention Agreement prohibiting the use and

26 disclosure of Illumina's confidential and proprietary information. Moreover, it stores its

27 confidential documents on a secure password-protected network and has instituted technologies

28 and processes to protect that information.

1    10.    On or about January 28, 2022, Mr. Gold accepted an offer to become Director,

2  Clinical Pathology at Verinata.

3    11.    On or about March 7, 2022, Mr. Gold began his employment with Illumina. As

4  part of his employment, Illumina provided Mr. Gold with a laptop computer, owned by Illumina,

5  to use in connection with his employment (the "Illumina Laptop"). The Illumina Laptop

6  contained, and provided access to, Illumina's confidential and proprietary data and documents.

7  During the course of his employment with Illumina, Mr. Gold had access to Illumina's most

8  sensitive confidential and proprietary information, including information that reveals Illumina's

9  processes, methodologies, and testing results, among other things. That information, if acquired

10  by a competitor, could be used to gain a competitive advantage against Illumina.

11  **B.    Mr. Gold Repeatedly Agrees to Return Illumina's Confidential Information Upon the**

12  **Conclusion of His Employment.**

13    12.    As a condition of his employment, Mr. Gold also entered into a "Proprietary

14  Information and Invention Agreement" with Illumina (the "PIIA"). A true and correct copy of the

15  PIIA is attached hereto as Exhibit B. In the PIIA, Mr. Gold expressly agreed, among other things,

16  that:

17
> At all times, both during my employment by the Employer and after
18  its termination, I will keep in confidence and trust and will not use or
> disclose any Proprietary Information or anything relating to it without
19  the prior written consent of an officer of the Company, except as may
> be necessary in the ordinary course and scope of employment with
20  the Employer.

21  (Exh. B, p. 1.)

22    13.    Mr. Gold also agreed that:

23
> I agree that during my employment with the Employer, I will not
> remove or electronically transmit any Company Documents from the
24  business premises of the Company . . . except as necessary in the
> ordinary course and scope of employment. I further agree that,
25  immediately upon the termination of my employment for any reason
> , . . . I will return all Company Documents, apparatus, equipment, and
26  other physical property, or any reproduction of such property . . . .

27  (Exh. B, p. 2.)

28  / / /

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

3

CLAIMANT ILLUMINA, INC.'S COMPLAINT

14.     The term "Company Documents" is defined broadly in the PIIA to include:

[D]ocuments or other media that contain Proprietary Information or any other information concerning the business operations or plans of the Company, or any of its current or future subsidiaries . . . whether such documents have been prepared by [Mr. Gold] or by others. "Company Documents" include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, sound recordings and other printed, typewritten or handwritten documents.

(Exh. B, p. 1.)

15.     The term "Proprietary Information" is defined in the PIIA as:

[I]nformation that was developed, created or discovered by the Company, or which became known or was conveyed to the Company, or any of its current or future subsidiaries, . . . and/or which has commercial value to the Company's business.   "Proprietary Information" includes, but is not limited to, trade secrets, copyrights, ideas, techniques, know-how, inventions (whether or not patentable), and/or any other information of any type relating to designs, configurations, toolings, documentation, recorded data . . . business plans, past or future financing, marketing, forecasts, pricing, customers, the salaries, duties, qualifications, performance levels, and terms of compensation of other employees, and/or cost or other financial data concerning any of the foregoing or the Company and its operations generally.

(Exh. B, p. 1.)

16.     On or about April 22, 2022, Illumina terminated Mr. Gold's employment.  Shortly thereafter, Mr. Gold returned the Illumina Laptop.

## C.      Mr. Gold Fails to Return All of Illumina's Property After His Employment

17.     Following receipt of Mr. Gold's laptop, Illumina learned that Mr. Gold had secretly, and in violation of Illumina company policy, transferred and retained its confidential and proprietary information using an external storage device *before* his last day of employment.  This information included, but is not limited to, hundreds of highly confidential and proprietary documents related to Illumina's prenatal testing business, including patient personal health information and reports; large portions of its ILS Quality system that describes every policy, procedure, and record Illumina runs on all of its tests, as well as the design of the tests themselves; Illumina's confidential and proprietary equipment lifecycle and maintenance protocols; and its quality control procedures.  In short, Mr. Gold took information that would help him operate his

1 own genetic consulting business. Illumina is informed and believes, and thereon alleges, that
2 during his employment with Illumina, Mr. Gold did just that, through his company Gold Standard
3 Genetics, LLC.

4      18.    For example, at approximately 6:55 PM on April 12, 2022, Mr. Gold plugged in a
5 large capacity external storage device to the Illumina Laptop, subsequently used Google to search
6 for ways to copy the entire Illumina Laptop to the external storage device,[1] and on April 13, 2022,
7 executed a command to copy the entire Illumina Laptop's documents folder to the external storage
8 device. The documents folder on the Illumina laptop contained Illumina's confidential and
9 proprietary information, including, among other things, dozens of documents specifically marked
10 "proprietary and confidential," "confidential," and "for internal use only" such as Illumina quality
11 manuals and clinical procedures and reports.

12      19.    In June 2022, Illumina learned that Mr. Gold had secretly, and in violation of its
13 policies, copied and, retained its confidential and proprietary documents onto an external storage
14 device, despite agreeing to keep Illumina's information confidential and promising to return all
15 documents at the conclusion of his employment. Mr. Gold did not have permission to transfer this
16 information or to retain it after his employment ended.

17      20.    Mr. Gold engaged in these actions without permission, for his own personal
18 benefit, and not in direct consequence of the discharge of his job duties or for Illumina's benefit.

19
### FIRST CLAIM FOR RELIEF

20
**(Violation of Penal Code section 502, *et seq.*)**

21      21.    Illumina realleges and incorporates by reference as though fully set forth herein
22 each and every allegation of paragraphs 1-20 above.

23  / / /

24  / / /

25  / / /

26

27  [1] For example, Mr. Gold's internet search history from April 13, 2022 reveals searches for, among
28 other things, "command line copy a directory and all its contents mac osx 11.6.4" and "cannot copy documents using enterprise macos."

1     22.    California Penal Code section 502 prohibits, among other things, knowingly

2 accessing and without permission using, altering, damaging, or destroying any data, computer,

3 computer system, or computer network in order to wrongfully control or obtain property or data of

4 another.

5     23.    Mr. Gold knowingly violated California Penal Code section 502 by, inter alia, (1)

6 accessing and transferring Illumina information, including confidential and proprietary

7 information, to his personal device(s); and (2) wrongfully controlling Illumina's information

8 without authorization.

9     24.    At all relevant times herein, Illumina owned and was entitled to exclusive use of

10 the information on its computers, computer systems, and computer networks.

11     25.    As a proximate result of Mr. Gold's actions, Illumina has been damaged in an

12 amount to be proved at the hearing.

13     26.    Mr. Gold willfully violated California Penal Code section 502 in disregard of

14 Illumina's rights, and his actions were carried out with oppression, fraud, and malice.

15     27.    Pursuant to California penal Code section 502, subdivisions (e)(1) and (4), as a

16 result of Mr. Gold's violations of section 502 as described above, Illumina is entitled to injunctive

17 relief, compensatory damages, punitive or exemplary damages, penalties, costs, and other

18 equitable relief.

19     28.    Pursuant to California Penal Code section 502, subdivision (e)(2), Illumina is also

20 entitled to an award of reasonable costs and attorneys' fees.

21     29.    Pursuant to California Penal Code section 502, subdivision (g), Mr. Gold shall

22 forfeit any computer, computer system, computer network, or any software or data that was used

23 during the commission of any acts in violation of California Penal Code section 502, or any

24 computer that was used as a repository for the storage of data illegally obtained in violation of

25 California Penal Code section 502.

26     30.    Mr. Gold engaged in these actions for his own personal benefit and not in direct

27 consequence of the discharge of his job duties or for Illumina's benefit.

28    ///

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

31.     Illumina realleges and incorporates by reference as though fully set forth herein each and every allegation of paragraphs 1-30 above.

32.     Mr. Gold has express contractual obligations arising from the PIIA he executed as part of his employment with Illumina.  Mr. Gold's obligations included the duty to keep confidential and not use or disclose any confidential or proprietary information belonging to Illumina, both during and after his employment; not to remove Illumina's confidential and proprietary documents from Illumina's premises; and to return all confidential and proprietary documents to Illumina upon the conclusion of his employment.

33.     Illumina performed all conditions precedent to enforcement of the PIIA.

34.     Mr. Gold's actions, as alleged herein, have breached his contractual obligations to Illumina, proximately causing Illumina to suffer injury and economic damages in an amount to be proven at the hearing.

35.     Mr. Gold engaged in these actions for his own personal benefit and not in direct consequence of the discharge of his job duties or for Illumina's benefit.

## PRAYER FOR RELIEF

WHEREFORE, Illumina prays judgment against Mr. Gold as follows:

1.     For compensatory damages according to proof, including, but not limited to, expenditures reasonably and necessarily incurred by Illumina to verify how its computer system, computer network, computer programs, and data were accessed, altered, damaged, or deleted by Mr. Gold;

2.     For exemplary damages;

3.     For an order requiring Mr. Gold to return to Illumina all confidential and proprietary information, and destroy all copies, whether paper or electronic, in his possession, custody, or control;

4.     For an order prohibiting Mr. Gold from using or disclosing any of Illumina's confidential and proprietary information for any purposes whatsoever;

1      5.     For an order that Mr. Gold submit to Illumina any electronic device used to access

2     or store the illegal data obtained in violation of California Penal Code section 502;

3      6.     For reasonable attorneys' fees;

4      7.     For costs of suit herein incurred; and

5      8.     For such other and further relief as the arbitrator may deem just and proper.

6  Dated: July 20, 2022            PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By:  _____

E. JOSEPH CONNAUGHTON
AARON J. SCHU
Attorneys for Claimant Illumina, Inc.